# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| Northumberland County Pension Fund, Derivatively On Behalf of Nominal Defendant AMEDISYS, INC., <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM F. BORNE, RONALD A. LABORDE, JAKE L. NETTERVILLE, DAVID R. PITTS, PETER F. RICCHIUTI, DONALD A. WASHBURN, DALE E. REDMAN, JEFFREY D. JETER, MICHAEL O. FLEMING, GREGORY H. BROWNE, JOHN F. GIBLIN, <br><br> Defendants, <br><br> - and - <br><br> AMEDISYS, INC., <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, for its verified shareholder derivative complaint, by its undersigned attorneys, alleges upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Amedisys, Inc. ("Amedisys" or the "Company"), against the Company's current members of its Board of Directors ("Board"), three current officers, and two former officers, seeking to remedy their intentional or reckless breaches of their fiduciary duties that caused substantial losses to the Company beginning in 2005 and continuing through the date this Complaint

was filed and into the foreseeable future (the "Relevant Period"). Plaintiff's allegations are made upon information and belief based on the investigation of its counsel (except as to the allegations in paragraph 6 below, which plaintiff makes on personal knowledge), which include, among other things, the complaints in the pending federal securities fraud actions against the Company and its senior management (collectively, the "Securities Fraud Actions"), the current formal investigation of the Company by the United States Senate Finance Committee ("SFC"), the Company's public filings with the United States Securities and Exchange Commission ("SEC"), analyst reports, press releases, media reporting, and other publicly available documents and information.

## OVERVIEW

2.    As detailed herein, the Individual Defendants (as defined herein) intentionally and/or recklessly engaged in misconduct and/or or utterly, consciously, and systemically ignored their duties with respect to the Company's management, policies, practices and internal controls regarding Medicare billing. It has been long-standing Company practice to request medically unnecessary in-home therapy appointments for its patients for the purpose of increasing the amount of reimbursement it receives from the Medicare system.

3.    Under the direction of the Individual Defendants, the Company's course of conduct has led to catastrophic financial results for which they are solely responsible, including but not limited to: the initiation of the SEC formal investigation, and the legal and other expenses incurred in responding thereto; the initiation of the SFC investigation, and the legal and other expenses incurred in responding thereto; the initiation of the Securities Fraud Actions, and the legal and other expenses incurred in responding thereto;

a decline in its market capitalization in excess of 50%; and damage to the Company's image, reputation, and goodwill. Moreover, the Company will continue to incur significant expenses in connection with the above; faces the prospect of substantial penalties resulting from the SEC investigation and liability from the Securities Fraud Actions; and may face an investigation by DOJ, the Department of Health and Human Services Office of the Inspector General ("HHS-OIG"), and others that could lead to enormous criminal and civil penalties under the False Claims Act ("FCA") and other statutes, including fines and forfeiture, a Corporate Integrity Agreement ("CIA"), and other sanctions such as exclusion from furnishing services under any Federal health care program, and legal and other expenses associated therewith.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

5.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, the principal place of business of nominal defendant Amedisys is located within this District and because many of the acts forming the basis for this action occurred in this District.

## PARTIES

**Plaintiff**

6.     Plaintiff is, and was at all times during the Relevant Period, a shareholder of Amedisys. Plaintiff brings this action derivatively in the right of and for the benefit of Amedisys. Plaintiff will fairly and adequately represent the interests of Amedisys and the shareholders of Amedisys in enforcing the rights of the Company. Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

7.     Nominal Defendant Amedisys is a Delaware corporation with its principal executive office located at 5959 South Sherwood Forest Boulevard, Baton Rouge, Louisiana 70816. Amedisys provides home health and hospice services to the chronic, co-morbid, and aging American population. Its home health services include skilled nursing and home health aide services; physical, occupational, and speech therapy; and medically oriented social work to eligible individuals who require ongoing care. The Company also offers clinically focused programs for chronic conditions and various diseases, such as diabetes, coronary artery disease, congestive heart failure, orthopedics, complex wound care, geriatric surgical recovery, balance retraining, behavioral health, and stroke recovery, as well as various rehabilitative programs. According to the Company's Form 10-K for fiscal year 2009, filed with the SEC on February 23, 2010 (the "2009 10-K"), the "typical home health patient is Medicare eligible, approximately 83 years old, takes approximately 12 different medications on a daily basis and has co-morbidities." Amedisys also provides hospice services to patients using an

interdisciplinary care team comprising a physician, nurses, home health aides, social workers, therapists, dieticians, volunteers, counselors, chaplains, and bereavement coordinators. The Company's hospice services include provision of medicines; medical equipment and supplies related to the hospice diagnosis; medication management to control pain and symptoms; physician services to manage medications; nursing and home health aide visits; volunteer services to provide companionship; and bereavement services. Amedisys stock is traded on the NASDAQ under the symbol "AMED."

**Director Defendants**

8.      Defendant William F. Borne ("Borne") founded Amedisys in 1982 and has served as the Company's Chairman of the Board and Chief Executive Officer ("CEO") since that time. Upon information and belief, Borne is a citizen of Louisiana.

9.      Defendant Ronald A. LaBorde ("LaBorde") has been an Amedisys director since 1997 and has served as the Company's Lead Director since 2003. According to the Company's Annual Proxy Statement filed with the SEC on Form DEF 14A on April 27, 2010 (the "2010 Proxy"), LaBorde is a member of the Company's Audit Committee, the Compensation Committee, the Nominating and Corporate Governance Committee, and the Investment Committee. Upon information and belief, LaBorde is a citizen of Louisiana.

10.      Defendant Jake L. Netterville ("Netterville") has been an Amedisys director since 1997. According to the 2010 Proxy, Netterville has served as Chairman of the Company's Audit Committee since 2003 and is also a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Upon information and belief, Netterville is a citizen of Louisiana.

11. Defendant David R. Pitts ("Pitts") has been an Amedisys director since 1997. According to the 2010 Proxy, Pitts is Chairman of the Company's Compensation Committee and is a member of the Nominating and Corporate Governance Committee, the Audit Committee, and the Investment Committee. Upon information and belief, Pitts is a citizen of Louisiana.

12. Defendant Peter F. Ricchiuti ("Ricchiuti") has been an Amedisys director since 1997. According the 2010 Proxy, Ricchiuti is Chairman of the Company's Investment Committee and a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. Upon information and belief, Ricchuiti is a citizen of Louisiana.

13. Defendant Donald A. Washburn ("Washburn") has been an Amedisys director since 2004. According to the 2010 Proxy, Washburn is Chairman of the Company's Nominating and Corporate Governance Committee and is a member of the Audit Committee and the Compensation Committee. Upon information and belief, Washburn is a citizen of Oregon.

**Current Officer Defendants**

14. Defendant Dale E. Redman ("Redman") has served as the Company's Chief Financial Officer ("CFO") since joining Amedisys in February 2007. Upon information and belief, Redman is a citizen of Louisiana.

15. Defendant Jeffrey D. Jeter ("Jeter") has served as the Company's Chief Compliance Officer ("CCO") since March 2004. According to the 2010 Proxy, Jeter also served as the Company's Vice President of Compliance/Corporate Counsel from April 2001 through March 2004. Upon information and belief, Jeter is a citizen of Louisiana.

16.     Defendant Michael O. Fleming ("Fleming") has served as the Company's Chief Medical Officer since joining Amedisys in September 2009 and was appointed an Executive Officer in October 2009.  Upon information and belief, Fleming is a citizen of Louisiana.

**Former Officer Defendants**

17.     Defendant Gregory H. Browne ("Browne") served as the Company's CFO from June 4, 2002 until his resignation effective as of June 7, 2006.  Upon information and belief, Browne is a citizen of Louisiana.

18.     Defendant John F. Giblin ("Giblin") served as the Company's CFO from October 23, 2006 until his resignation effective as of February 21, 2007.  Upon information and belief, Giblin is a citizen of Louisiana.

19.     The defendants identified in paragraphs 8 through 13 are collectively referred to herein as the "Current Director Defendants."

20.     The defendants identified in paragraphs 8 through 18 are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

21.     By reason of their positions as directors and/or officers of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders and not in

furtherance of their personal interest or benefit. Each director and officer of the Company owed and owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

22.     The Individual Defendants, because of their positions of control and authority as directors or officers of the Company, were able to and did, directly and indirectly, commit or fail to prevent the wrongful acts complained of herein. Because of their directorial and executive positions with the Company, each of the Individual Defendants had access to adverse non-public information about the financial condition and operations of the Company, including, without limitation, the misconduct of the other Individual Defendants.

23.     At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of said agency.

24.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the financial, business, and corporate affairs of the Company. By virtue of such duties, the officers and directors of the Company were required, among other things, to:

    a.    Manage, conduct, supervise and direct the business affairs of the Company in accordance with the laws of the United States, the states in which it conducted business, and the Company's charter and bylaws;

b.      Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors, and employees of the Company from violating or acting in contravention to applicable federal and state laws, rules and regulations; and

c.      Refrain from using their status as directors or officers to the detriment of the Company and its shareholders.

25.     Certain Individual Defendants assumed additional fiduciary duties in connection with their service on the Board's Audit Committee, duties they were required to exercise with loyalty and in good faith.  According to its charter, the purpose of the Audit Committee is "to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

26.     The Audit Committee is required, among other things:

with respect to accounting principles and policies and financial reporting . . .

*to inquire* of the Company's chief executive officer and chief financial officer as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting;

to meet with management, the independent auditors and, if appropriate, the director of the internal auditing department . . . to discuss, as appropriate: (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (c) the effect of regulatory and accounting initiatives, as

well as off-balance sheet structures, on the financial statements of the Company;

to discuss with the Company's General Counsel any significant legal, compliance or regulatory matters that may have a material effect on the financial statements or the Company's business, financial statements or compliance policies;

to discuss and review the type and presentation of information to be included in earnings press releases; and

to discuss the types of financial information and earnings guidance provided, and the types of presentations made, to analysts and rating agencies.

[W]ith respect to reporting and recommendations:

to prepare any report or other disclosures, including any recommendation of the Audit Committee, required by the rules of the SEC to be included in the Company's annual proxy statement.

(Emphasis added).

27. The members of the Audit Committee are Current Director Defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn, who comprise five of the six members of the Board both during the Relevant Period and at the time this Complaint was filed.

28. The 2009 10-K states the following about Medicare billing:

**Controls over Our Business System Infrastructure**
We establish and maintain processes and controls over coding, clinical operations, billing, compliance and patient recertifications to help ensure that we are compliant with Medicare requirements.

*Coding*
Specified diagnosis codes are assigned to each of our patients based on their particular health condition and ailment (such as diabetes, coronary artery disease or congestive heart failure). Because coding regulations are complex and are subject to frequent change, we maintain controls surrounding our coding process. In order to reduce associated risk, we provide coding training for new agency directors and clinical managers; provide annual coding update training for agency directors and clinical

managers; provide coding training during orientation for new employees; provide monthly specialized coding education; circulate a clinical operations quality newsletter; obtain outside expert coding instruction; utilize coding software in our POC system; and have automated coding edits based on pre-defined compliance metrics in our POC system.

*Clinical Operations*

Regulatory requirements allow patients to be admitted to home health care if they are considered homebound and require certain clinical services. These clinical services include: educating the patient about their disease; an assessment of observation skills; wound care, administering injections or intravenous fluids; and management and evaluation of a patient's plan of care. In order to help ensure our agencies are following applicable regulatory requirements, we complete audits of patient charts (locally, by line management regional staff, for Sarbanes-Oxley compliance and by Direct line supervisors); we use risk forecasting methodologies; we utilize regulatory "turnaround teams" when problems are identified; we administer survey guideline education; we hold recurrent homecare regulatory education; we utilize outside expert regulatory services; and we have a toll-free hotline to offer additional assistance.

*Billing*

**We maintain comprehensive controls over our billing processes to help ensure accurate and complete billing.** We have company-wide annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; deploy operational "turnaround teams" when problems are identified; **and terminate employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".**

*Patient Recertification*

In order to be recertified for an additional episode of care, a patient must be diagnosed with a continuing medical need. This could take the form of a continuing skilled clinical need or could be caused by changes to the patient's medical regimen or by modified care protocols within the episode of care. As with the initial episode of care, a recertification requires approval of the patient's physician. **Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care conference.** We also use centralized automated compliance recertification indicators to identify and monitor agencies that have relatively high recertification levels.

*Compliance*

The quality and reputation of our personnel and operations are critical to our success. We develop, implement and maintain comprehensive ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies. Our ethics and compliance program is administered by our Chief Compliance Officer, a former state prosecutor, and includes a Code of Ethical Business Conduct for our employees, officers, directors and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer through a confidential hotline. ***We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy.*** We also employ a comprehensive compliance training program that includes: annual compliance testing; new hire compliance training; new acquisition compliance training; sales compliance training; new employee orientation—compliance education; billing compliance training; and compliance presentations at all company functions, Our executive compliance committee includes our Chief Executive Officer, Chief Operating Officer and President, Chief Financial Officer, Chief Information Officer and Senior Vice President of Clinical Operations, Chief Compliance Officer, Senior Vice President of Human Resources and Senior Vice President of Internal Audit, and meets on a quarterly basis to establish the agenda for compliance initiatives and review the status of compliance initiatives and audits, as well as the operations of our Compliance Department.

(Emphasis added).

29.     The 2009 10-K, which included the statement that "We . . . terminate employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized 'Zero Tolerance Policy,'" was signed by all six of the Current Director Defendants.

30.     The Company has a Code of Ethical Business Conduct ("CEBC") that applies to all directors, officers, and employees. The purpose of the CEBC is "to ensure [the Company's] business is conducted with integrity and in compliance with applicable governmental laws, rules and regulations." The CEBC warns that "*[a]ny director, officer*

or employee *who violates the policies and guidelines in this Code* will be subject to disciplinary action, up to and including termination of employment or removal as a director *and may be personally liable to the Company* and/or its shareholders and/or third parties (including but not limited to the federal and state government)." (Emphasis added).

31.    The CEBC states the following regarding "Billing:"

Amedisys officers and employees who are involved in the billing and collection function are expected to understand and comply with all billing-related policies and procedures established by the Company, as well as applicable requirements of third-party payors (including Medicare and Medicaid) to which home healthcare service and product claims are submitted.

Amedisys shall bill only for goods and services that are properly ordered and delivered or performed, as appropriate. In no event shall the Company bill for equipment beyond the date it is provided, and Amedisys should only bill for goods and services for which appropriate documentation exists.

All coding of services must conform to applicable government regulations and commercial payor instructions. All required billing information (including diagnosis coding) must be collected and recorded accurately. All contact with customers to obtain missing information must be properly documented.

Amedisys directors, officers and employees are expected to cooperate fully with all internal and external audits of the Company's billing system. If you discover any coding error in the billing system, the matter should be brought to the attention of your supervisor so that he or she may determine the nature and magnitude of the problem and the appropriate corrective action. The Company's policy is to refund any overpayments received as a result of coding errors and to notify the appropriate carrier or commercial payor of the problem. All such matters should also be brought to the attention of your Director of Operations and, in the case of government billings, to the attention of the Chief Compliance Officer.

Amedisys may not routinely waive or write off co-payments and deductibles for services rendered. Such a practice could cause the Company to violate its contractual obligations to carriers as well as certain governmental regulations.

You should consult the Company's Billing Department and Finance Department for questions pertaining to government billing and commercial billing.

32.     The Company has acknowledged the potential consequences of non-compliance with applicable laws.  For example, the 2009 10-K states the following:

**Medicare Participation**

As we expect to continue to receive the majority of our revenue from serving Medicare beneficiaries, our agencies must comply with regulations promulgated by the Department of Health and Human Services in order to participate in the Medicare program and receive Medicare payments. Among other things, these regulations, known as "conditions of participation," relate to the type of facility, its personnel and its standards of medical care, as well as its compliance with state and local laws and regulations. [The Center for Medicare and Medicaid Services] CMS has indicated that it will be revising the current home health conditions of participation but a publication date of such revisions has not been established.

**Federal and State Anti-Fraud and Anti-Kickback Laws**

As a provider under the Medicare and Medicaid systems, we are subject to various anti-fraud and abuse laws, including the Federal health care programs' anti-kickback statute and, where applicable, its state law counterparts. These laws prohibit any offer, payment, solicitation or receipt of any form of remuneration to induce or reward the referral of business payable under a Federal health care program or in return for the purchase, lease, order, arranging for, or recommendation of items or services covered by any Federal health care program or any health care plans or programs that are funded by the United States government (other than certain Federal employee health insurance benefits) and certain state health care programs that receive Federal funds under various programs, such as Medicaid. A related law forbids the offer or transfer of any item or service for less than fair market value, or certain waivers of co-payment obligations, to a beneficiary of Medicare or a state health care program that is likely to influence the beneficiary's selection of health care providers. ***Violations of the anti-fraud and abuse laws can result in the imposition of substantial civil and criminal penalties and, potentially, exclusion from furnishing services under any Federal health care program.*** In addition, the states in which we operate generally have laws that prohibit certain direct or indirect payments or fee-splitting

arrangements between health care providers where they are designed to obtain the referral of patients from a particular provider.

### *Stark Laws*

Congress adopted legislation in 1989, known as the "Stark Law," that generally prohibits a physician from ordering clinical laboratory services for a Medicare beneficiary where the entity providing that service has a financial relationship (including direct or indirect ownership or compensation relationships) with the physician (or a member of his/her immediate family), and further prohibits such entity from billing for or receiving payment for such services, unless a specified exception is available. Additional legislation, known as "Stark II," became effective January 1, 1993. That legislation extends the Stark Law prohibitions to services under state Medicaid programs and beyond clinical laboratory services to all "designated health services," which include home health services. Violations of the Stark Laws result in payment denials and may also trigger civil monetary penalties and program exclusion. Accordingly, physicians who are compensated by us are prohibited under Stark II from making referrals to us for designated health services, including home health services covered by Medicare or Medicaid, unless an exception applies. One such exception we rely upon is for certain personnel service arrangements, which allows us to contract with certain physicians at fair market value to provide consulting work to our agencies. Another exception that we rely upon is a safe harbor allowing us to lease office space from certain physicians at fair market value for legitimate and commercially reasonable business purposes. Several of the states in which we conduct business have also enacted statutes similar in scope and purpose to the Federal fraud and abuse laws and the Stark Laws. These state laws may mirror the Federal Stark Laws or may be different in scope. The available guidance and enforcement activity associated with such state laws varies considerably.

\*   \*   \*

### *The False Claims Act*

The Federal False Claims Act gives the Federal government an additional way to police false bills or requests for payment for healthcare services. Under the False Claims Act, the government may fine any person who knowingly submits, or participates in submitting claims for payment to the Federal government which are false or fraudulent, or which contain false or misleading information. Any person who knowingly makes or uses a false record or statement to avoid paying the Federal government may also be subject to fines under the False Claims Act. Under the False Claims Act, the term "person" means an individual, company, or corporation. The

Federal government has widely used the False Claims Act to prosecute Medicare and other governmental program fraud in areas such as violations of the Federal anti-kickback statute or the Stark Laws, coding errors, billing for services not provided, and submitting false cost reports. *The False Claims Act has also been used to prosecute people or entities* which bill services at a higher reimbursement rate than is allowed and *billing for care that is not medically necessary. The penalty for violation of the False Claims Act is a minimum of $5,500 for each fraudulent claim plus three times the amount of damages caused to the government as a result of each fraudulent claim.*

*In addition to the False Claims Act, the Federal government may use several criminal statutes to prosecute the submission of false or fraudulent claims for payment to the Federal government.* Many states have similar false claims statutes that impose liability for the types of acts prohibited by the False Claims Act. As part of the Deficit Reduction Act of 2005 (the "DRA"), Congress provided states an incentive to adopt state false claims acts consistent with the Federal False Claims Act. Additionally, the DRA required providers who receive $5 million or more annually from Medicaid to include information on Federal and state false claims acts, whistleblower protections and the providers' own policies on detecting and preventing fraud in their written employee policies. These relatively new requirements are intended to expand the number and scope of false claims cases in the health care industry.

### Civil Monetary Penalties

*The United States Department of Health and Human Services ("HHS") may impose civil monetary penalties upon any person or entity who presents, or causes to be presented, certain ineligible claims for medical items or services. The amount of penalties varies, depending on the offense, from $2,000 to $50,000 per violation.* In addition, persons who have been excluded from the Medicare or Medicaid program and still retain ownership in a participating entity, or who contract with excluded persons, may be penalized. Penalties also are applicable in certain other cases, including violations of the Federal anti-kickback statute, payments to limit certain patient services, and improper execution of statements of medical necessity.

(Emphasis added).

33.     The Company acknowledged that non-compliance with the above-described laws posed a material risk to its financial condition.  For example, the 2009 10-K stated:

**Risks Related to Our Business**

*               *               *

***We are subject to extensive government regulation. Any changes to the laws and regulations governing our business, or to the interpretation and enforcement of those laws or regulations, could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows.***

Extensive Federal and state laws and regulations regulate our industry. . . . Federal and state laws and regulations impact how we conduct our business, the services we offer and our interactions with patients and the public and impose certain requirements on us such as:

- licensure and certification;
- adequacy and quality of health care services;
- qualifications of health care and support personnel;
- quality and safety of medical equipment;
- confidentiality, maintenance and security issues associated with medical records and claims processing;
- relationships with physicians and other referral sources;
- operating policies and procedures;
- addition of facilities and services; and
- ***billing for services.***

These laws and regulations, and their interpretations, are subject to change. Changes in existing laws and regulations, or their interpretations, or the enactment of new laws or regulations could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows by:

- ***increasing our liability;***
- ***increasing our administrative and other costs;***
- increasing or decreasing mandated services;
- forcing us to restructure our relationships with referral sources and providers; or
- ***requiring us to implement additional or different programs and systems.***

***Additionally, we are subject to various routine and non-routine reviews, audits and investigations by the Medicare and Medicaid programs and other Federal and state governmental agencies, which have various rights and remedies against us if they assert that we have overcharged the programs or failed to comply with program requirements. Violation***

*of the laws governing our operations, or changes in interpretations of those laws, could result in the imposition of fines, civil or criminal penalties, and the termination of our rights to participate in Federal and state-sponsored programs and/or the suspension or revocation of our licenses. If we become subject to material fines or, if other sanctions or other corrective actions are imposed on us, our business and consolidated financial condition, results of operations and cash flows could be materially adversely affected.*

*       *       *

*We are subject to Federal and state laws that govern our financial relationships with physicians and other health care providers, including potential or current referral sources; certain agencies acquired by us from Home Health Corporation of America ("HHCA") are operating under a Corporate Integrity Agreement ("CIA").*

We are required to comply with Federal and state laws, generally referred to as "anti-kickback laws," that prohibit certain direct and indirect payments or other financial arrangements between health care providers that are designed to encourage the referral of patients to a particular provider for medical services. In addition to these anti-kickback laws, the Federal government has enacted specific legislation, commonly known as the "Stark Law," that prohibits certain financial relationships, specifically including ownership interests and compensation arrangements, between physicians (and the immediate family members of physicians) and providers of designated health services, such as home health agencies, to whom the physicians refer patients. Some of these same financial relationships are also subject to additional regulation by states. Under both anti-kickback laws and the Stark Law, there are a number of safe harbors and exceptions that permit certain carefully constructed relationships. To the extent feasible, we avail ourselves of these safe harbors. With respect to the Stark Law, compliance with an applicable exception is mandatory and we have contractual relationships with potential referral sources, including physicians. For example, we currently have contractual relationships with certain physicians who provide consulting services to our company. Many of these physicians are current or potential referral sources. In addition, in some of our local markets, we lease office space from physicians who may also be referral sources. We cannot assure you that courts or regulatory agencies will not interpret state and Federal anti-kickback laws and/or the Stark Law and similar state laws regulating relationships between health care providers and physicians in ways that will implicate our practices. Violations of these laws could lead to fines or sanctions that could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows.

(Emphasis added).

<u>**SUBSTANTIVE ALLEGATIONS**</u>

34.     According to the 2009 10-K, the Company's "services are primarily paid for by Medicare, which represented approximately 88%, 87%, and 89% of [its] net service revenue in 2009, 2008 and 2007, respectively," and it "expect[s] home health and hospice services reimbursed by Medicare to remain [its] primary focus over the near and intermediate term."

35.     Between 2000 and 2007, the Medicare system reimbursed home health care providers with a flat fee of approximately $2,200 for a 60-day period of at-home nursing care, including up to nine at-home visits from occupational, physical, or speech therapists.  Providers received an additional fee of approximately $2,200 for the tenth therapist visit.  The payment system was changed in 2008 to provide more modest additional fees upon the sixth, fourteenth, and twentieth therapy visits.

36.     On April 26, 2010, the *Wall Street Journal* published an article (the WSJ article") in which it questioned whether Amedisys was "taking advantage of the Medicare reimbursement system" because its analysis revealed that "the number of in-home therapy visits tracks Medicare financial incentives."  The WSJ article stated that:

> Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits. . . . In 2007 . . . 28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment.

According to the WSJ article, the Company stated that between 55% and 60% of its patients receive home therapy.

37. The WSJ article quoted a former Amedisys nurse who stated "I was told 'we have to have ten visits to get paid,'" that her supervisors asked her to review patient files to find those who were just short of the ten-visit threshold, and to call their therapists to remind them to make the extra appointment. The former nurse stated "[t]he tenth visit was not always medically necessary." This is contrary to the Company's claim in the 2009 10-K that "[b]efore any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care conference," as well as the language in the CEBC that "Amedisys shall bill only for goods and services that are properly ordered and delivered or performed, as appropriate." The WSJ article noted that while physicians determine the number of visits necessary in order for the provider to be reimbursed, they "aren't required to see a patient in person to recommend them for home health-care or examine their progress," and "[s]ome rely on home therapists to provide guidance on the number of visits a patient requires." It quoted a doctor of internal medicine who said "Generally, I leave it up to the therapist because that's what they're best at," and "It's pretty rare for me to disapprove of what they do."

38. In addition, according to the WSJ article, after the reimbursement rules were modified in 2008, "the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that [sic] got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%."

39. The following day, April 27, 2010, Amedisys stock lost $3.98, falling from $60.50 per share to close at $56.52 per share.

40. On May 12, 2010, the Chairman and the Ranking Member of the SFC announced an investigation regarding the relationship between the number of home

health therapy visits provided by the four largest for-profit home health care agencies, including Amedisys, and Medicare reimbursement rate for those visits. The investigation was prompted by the WSJ article.

41. The same day, the Chairman and the Ranking Member sent a letter (Exhibit A hereto) to Current Director Defendant Borne requesting the following information:

1) For each calendar year from 2006 through 2009, provide data showing the distribution in one day intervals from 1 to 30 of therapy visits for therapy episodes (episodes which include at least one therapy visit) by both number and percentage.

2) For each year from calendar 2006 through 2009, provide data showing the average score at admission for Medicare patients that received therapy visits for each of the following activities of daily living as reported in the Outcomes and Assessment Information Set (OASIS):
   a. Walking/Ambulation;
   b. Hygiene;
   c. Continence;
   d. Dressing;
   e. Eating;
   f. Toileting; and
   g. Transferring.

3) For each calendar year from 2006 through 2009, also provide:
   a. The total number of Medicare home health patients that received therapy visits from your company for that year;
   b. The total amount of Medicare reimbursement your company received for home health episodes that qualified for additional payments because of therapy visits provided; and
   c. The total amount of Medicare reimbursement your company received.

4) All internal documents, records, and communications relating to the 2008 Medicare payment revisions for home health therapy visits from January 1, 2007 to the present. Please include all communications regarding changes to the Amedisys Medical Software applications as a result of the 2008 Medicare payment revisions. In addition, include copies of all audit reports conducted internally and externally including draft and unfinished versions.

5) All internal policies and guidelines regarding the number of therapy visits provided per home health episode. Please include any prior policies and guidelines from January 1, 2007 to the present, including all modifications to those policies.

6) For each state in which you provide home health services, provide a list of the 10 physicians from whom you received the highest number of referrals for home health services in each of the calendar years 2006, 2007, 2008, and 2009. For each physician, please include the physician's specialty, location, and the number of referrals.

7) For each physician identified in the response to question 6, please provide all payments or transfers of value from your company, or any entity acting at your company's direction, to that physician for calendar years 2006, 2007, 2008, and 2009. This information should include:
    a. The recipient's name, business address, and specialty;
    b. A description of the form of payment or transfer of value (cash, stock, travel, meals, etcetera);
    c. A description of the nature of payment or transfer of value (royalty, consulting, speaking fee, gift, etcetera); and
    d. The date of payment.

8) Provide copies of all marketing materials produced for patients and physicians for calendar years 2006, 2007, 2008, and 2009.

9) Provide all copies of guidance or instructions to marketing staff on appropriate physician and patient marketing practices (including payments and transfers of value to physicians) for calendar years 2006, 2007, 2008 and 2009.

10) Indicate whether your company has a compliance program, and if so:
    a. Indicate whether you provide a toll free number for purposes of reporting inappropriate marketing activities;
    b. Indicate the number of times in each of the calendar years 2006, 2007, 2008 and 2009 complaints were received regarding marketing activities as well as the nature and resolution of each complaint;
    c. Provide documentation on the compliance program including previous policies from 2006 to the present.

11) Provide copies of all physician attestation forms with an explanation of the process for physician attestations for calendar years 2006, 2007, 2008, and 2009.

12) Please explain the clinical criteria consulted by Amedisys in drafting each patient question on the Balanced for Life – Fall Risk Assessment physician attestation form. (Attached)

13) Indicate whether you have medical directors serve each of your home health agencies. If so, please provide the following:

a. Identify the duties and responsibilities of medical directors for your home health agencies;

b. The average number as well as range of physicians that serve your home health agencies;

c. The five most common specialties that are represented by medical directors across all your home health agencies;

d. The average number of physicians in each of the specialties identified in question 12.b. that serve as medical directors at a home health agency of your company;

e. The percentage of medical directors that are employees of your company and the percentage of medical directors that serve under contractual arrangement; and

f. For medical directors that serve under contractual arrangement, identify the method of compensation as well as the average number and range of hours worked per week.

(footnote omitted).

42.     The SFC investigation was reported in the Wall Street Journal on May 13, 2010.  The May 13 article noted that the SFC showed particular interest in Amedisys' "Balanced for Life" fall-prevention program that, according to the SFC's letter to Current Director Defendant Borne, "raises concerns that the program may be taking advantage of Medicare payments in order to improve company profits."  The May 13 article stated that a representative from the Company said it would cooperate with the investigation.

43.      Also on May 13, 2010, the Company issued a press release responding to the SFC letter.  While the press release claimed that the WSJ article, which was referenced in the SFC letter, "told an incomplete story about the value of home health to patients, their families, and the overall healthcare system," Current Director Defendant Borne was quoted therein as stating "[w]e will cooperate with the Committee's inquiry.

We also look forward to discussing with the Senators the many benefits and advantages home health care provides for the millions of Americans our industry serves."

44.    On May 13, 2010, Amedisys shares closed at $51.73, a decline of $4.48 from the previous day's closing.

45.    On June 30, 2010, after the close of trading, the Company issued a press release in which it announced that it received notice of a formal investigation from the SEC, as well as a subpoena for documents from the SFC. Amedisys stated it intended to cooperate with the SEC investigation.

46.    The press release was attached to a Form 8-K filed with the SEC on July 1, 2010. In addition to repeating the news about the SEC formal investigation and the SFC subpoena, the Form 8-K stated that Amedisys "submitted its initial response to the [SFC] on June 4, 2010, and the Company made an additional submission to the [SFC] on June 25, 2010. The Company anticipates making additional submissions of information to the [SFC]. Each of the responses contained documentation and information as requested by the [SFC]. The Company intends to cooperate with the [SFC] with respect to its inquiry. No assurances can be given as to the timing of this inquiry or as to the outcome of this inquiry." Similarly, the Company admitted that no assurances could be given as to the timing or outcome of the SEC investigation.

47.    On July 1, 2010, Amedisys shares closed at $39.34 per share, a loss $4.64 per share from their closing price on June 30, 2010, of $43.98 per share.

48.    The Securities Fraud Actions were filed between June 10, 2010 and July 16, 2010. They alleged that the Company, Current Director Defendant Borne, and Individual Defendant Redman violated Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, by making false and/or misleading statements, as well as failing to disclose material adverse facts, about the Company's business, operations, and prospects from February 23, 2010, through and including May 13, 2010, specifically (1) that the Company's reported sales and earnings growth were materially affected by a scheme whereby the Company intentionally increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system as those excess visits were not always medically necessary; (2) that the Company's reported sales and earnings were inflated by said scheme and subject to recoupment by Medicare; (3) that the Company was in material violation of its Code of Ethical Business Conduct and compliance due to the scheme to inflate Medicare revenues; and (4) based on the foregoing, the defendants lacked a basis for their positive statements about the Company, its prospects and growth, all of which caused a "precipitous decline" in the price of the Company's shares.

49.     On July 12, 2010, after markets closed, the Company issued a press release in which it announced its preliminary results for the second quarter of 2010. The Company estimated its second quarter net income would be approximately $1.12 per share, instead of the $1.36 per share expected by analysts. The Company reported costs of 17 cents per share primarily associated with realignment of operations, and the Senate Finance Committee and SEC investigations. The 17 cents in costs, partly attributable to the expense of the Senate Finance Committee and SEC investigations,

translates into almost $5 million and as conceded by the Company will continue to accumulate.

50.     Market reaction to the press release was instantaneous and furious. Amedisys shares, which had closed at $35.02 on July 12, opened at $28.99 on July 13, and sank as low as $24.66 before closing at $26.57.  In a mere 24 hours, AMED shares lost $8.45, or over 24% of their value.  R.W. Baird, RBC Capital Markets, and Jeffries, among others, promptly downgraded the Company's shares.  Since their one-year high of $62.99 as recently as April 14, 2010, Amedisys shares had lost $36.42, or nearly 58% of their value.

## THE COMPANY'S HISTORY OF NON-COMPLIANCE
## WITH MEDICARE BILLING REQUIREMENTS

51.     The Company has a history of legal trouble regarding Medicare billing. On November 10, 2003, the Company and its wholly-owned subsidiary Amedisys Specialized Medical Services, Inc. ("ASMS") entered into a settlement agreement with the United States Department of Justice ("DOJ") and the HHS-OIG to resolve "certain civil and administrative monetary claims and causes of action" alleged by the federal government against ASMS "under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended, under the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a, under the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, and under common law, for knowingly engaging in the following conduct during the period from 1994 to 1999:

> – From 1994 - 1999, the Company's Monroe, Louisiana, office which was acquired in 1994, billed for services not rendered and submitted invalid cost report deductions.

> – The billing for services not rendered was facilitated by the agency's alteration of records, falsification of physician/patient signatures and falsification of nurse's notes. The invalid cost report deductions

consisted of salaries deducted for individuals who did not perform work for the Company."

52      .Under the settlement agreement, ASMS agreed to pay the government the sum of $1,156,587.90. The settlement agreement was signed on behalf of ASMS by Current Director Defendant Borne and Individual Defendant Jeter. It also incorporated by reference a CIA executed by HHS-OIG, Amedisys, and ASMS dated November 10, 2003.

53.     The purpose of the CIA was to "to *promote compliance by [Ameridys' and ASMS'] officers, directors, employees, contractors, and agents with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs.*" (Emphasis added). The compliance obligations under the CIA continued for three years after its effective date. The CIA was signed on behalf of Amedisys and ASMS by Current Director Borne and Individual Defendant Jeter.

54.     Under the CIA, the Company was required to maintain a compliance program that included, among other things, appointing a CCO "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements," and who would be responsible for reporting to the Board; maintaining its existing Compliance Committee; maintaining its existing Standards of Conduct and "mak[ing] the promotion of, and adherence to, the 'Standards of Conduct' an element in evaluating the performance of all employees;" "maintain[ing], and update[ing] as necessary, its written Policies and Procedures regarding the operation of Amedisys' compliance program and its compliance with Federal health care program requirements;" providing appropriate training; engaging an "Independent Review

Organization" such as an accounting, auditing, or consulting firm "to perform reviews at [ASMS] to assist Amedisys in assessing and evaluating its billing and coding practices and certain other obligations pursuant to this CIA and the Settlement Agreement," including a claims review, an unallowable cost review, and potentially a systems review; maintaining a Disclosure Program for employees and other individuals; requiring the reporting of Medicare overpayments and material deficiencies that led to substantial overpayments; and mandating annual reporting and certifications by the CCO.

55    .In addition to Current Director Defendant Borne, Current Director Defendants LaBorde, Netterville, Pitts, and Ricchiuti were all members of the Board when the settlement agreement and the CIA were executed.

56.    On October 1, 2008, Amedisys acquired the Mid-Atlantic operations of Home Health Corporation of America, Inc. ("HHCA"), a provider of home nursing and related patient services.  HHCA had its own billing issues, having run afoul of the Stark Law.  In 2005, HHCA signed a settlement agreement with DOJ and a CIA with HHS-OIG.

57.    As set forth in the Company's Form 10-K for fiscal year 2008, which was filed with the SEC on February 17, 2009:

> We acquired certain assets and assumed certain liabilities of HHCA on October 1, 2008, which was subject to a five-year CIA with the Office of Inspector General for the United States Department of Health and Human Services ("OIG") as of the date of the transaction. HHCA entered into the CIA in 2005 as a result of the settlement of claims arising out of an alleged kickback scheme dating from February 1997 through May 1998. ***Although the ownership of the HHCA agencies has changed, the provisions of the CIA remain binding on us as HHCA's successor and remain in effect until May 17, 2010, or until such time thereafter as the OIG reviews the final annual report submitted.*** Based on our review of the CIA and discussions with both outside counsel and representatives of the OIG, we believe these contractual obligations and the associated risks

are applicable solely to the six home health agencies acquired from HHCA in Pennsylvania, Maryland and Delaware. The CIA requires that we maintain HHCA's existing compliance program and provides for additional training requirements for certain staff involved in business development functions, the implementation of certain tracking and reporting processes related to financial relationships with referral sources, an annual, independent review of financial relationships with referral sources, and regular reporting to the OIG. The CIA also provides for stipulated penalties in the event of non-compliance by us, including the possibility of exclusion from the Medicare program. Although we believe that we are currently in compliance with the CIA, any violations of that agreement could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows.

(Emphasis added). The 2009 10-K contained the same language.

58. Amedisys thus has operated under two separate CIAs during the past seven years.

## DEMAND IS FUTILE

59.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of breaches of fiduciary duty by the Individual Defendants.

60.     .Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

61.     Plaintiff is the owner of Amedisys common stock and was at all times during the Relevant Period.

62.     Plaintiff has not made a demand on the Board of Directors to bring this cause of action because such a demand would be futile. Currently, the Company's Board consists of six members: Current Director Defendants Borne, LaBorde, Netterville, Pitts, Ricchiuti, and Washburn. As discussed in detail below, all of the directors at the time this complaint was filed have specific personal conflicts of interest or have demonstrated their individual inability to act independently and impartially.

63    .As summarized below and specified herein, demand is excused because this Complaint alleges with particularity that all of the members of the current Board intentionally or recklessly: (a) directly participated in the wrongs alleged herein to benefit themselves at the expense of the Company; and/or (b) utterly, consciously, and systemically failed to adopt reasonable internal controls, policies, and independent monitoring systems to ensure proper oversight of management and to provide responsible Medicare billing and accurate financial reporting.

## A.    Company Officer - Current Director Defendant Borne

64.    Current Director Defendant Borne is the Company's founder, Chairman, and CEO.  According to the Company's Schedule 14A filed with the SEC on April 27, 2010, Current Director Defendant Borne earned $4,315,788 in 2009 as a result of his duties

65.    Current Director Defendant Borne is both an officer and a director of the Company and derives substantial compensation from his position as CEO.  As such, he is incapable of making an independent or disinterested decision as to whether to initiate suit on behalf of the Company.

66.    In addition, Current Director Defendant Borne is a named defendant in the Securities Fraud Actions.  A derivative action is likely to expose his own misconduct and increase his probability of liability in the Security Fraud Action and other possible litigation, and potentially even expose him to criminal penalties.  As such, he is in no position to render an impartial decision as to whether to bring an action on behalf of the Company against himself.

**B.    The Audit Committee - Current Director Defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn**

67.    Current Director Defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn are and have been members of the Audit Committee during the Relevant Period.  As such, they were required to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

68.    *At a minimum,* the members of the Audit Committee utterly, consciously, and systemically failed to exercise their oversight responsibilities required by the Audit Committee charter by:  failing to inquire of the Company's chief executive officer and chief financial officer as to the existence of any fraud, whether or not material, namely the practice of arranging medically unnecessary therapy appointments in order to receive additional Medicare payments, that involves management or other employees who have a significant role in the Company's internal control over financial reporting; failing to inquire of the Company's chief executive officer and chief financial officer as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting, namely the practice of arranging medically unnecessary therapy appointments in order to receive additional Medicare payments,  that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; failing to meet with management about major issues as to the adequacy of the Company's internal controls, namely the practice of arranging medically unnecessary therapy appointments in order to receive additional Medicare payments; and failing to discuss with the Company's General Counsel significant legal, compliance or regulatory matters that would have a material effect on

the financial statements or the Company's business, financial statements or compliance policies, such as non-compliance with the FCA, criminal statutes, and HHS civil penalties described in the 2009 10-K that would result from the practice of arranging medically unnecessary therapy appointments in order to receive additional Medicare payments.

69.     The utter, conscious, and systemic failure of Current Director Defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn to exercise their responsibilities required by the Audit Committee charter, all of which culminated to date in the Securities Fraud Actions, the SFC investigation, the SEC investigation, the precipitous drop in the Company's market capitalization, and which may lead to a DoJ investigation and potentially severe criminal and/or civil penalties, constitutes a breach of their duties of good faith and loyalty such that they face a substantial likelihood of personal liability for their actions/inaction.

70.     The members of the Audit Committee are lacking in independence and cannot impartially consider a demand on the Board to commence litigation against them. As they constitute five of the six members of the Board as of the date this Complaint was filed, a clear majority, plaintiff has established that demand is futile for the reasons stated in paragraphs 67-70.  In addition, because Current Director Defendant Borne cannot be independent or disinterested for the reasons discussed in paragraphs 64-66, demand is futile with respect to the entire Board.

## C.    The Board as a Whole

71.    All of the Current Director Defendants intentionally or recklessly encouraged, permitted, and/or aided and abetted the improper Medicare billing practices alleged herein, that is to say, the scheduling of medically unnecessary in-home therapy appointments for the purpose of receiving additional Medicare reimbursements, and/or utterly, consciously, and systemically disregarded, or failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of the Company from violating or acting in contravention to, applicable legal requirements despite a Company history of compliance issues involving Medicare billing.

72.    The Current Director Defendants engaged in the misconduct described herein despite their knowledge of "red flags" of prior egregious wrongdoing, in that five of the six Current Director Defendants were Board members when the Company signed the settlement agreement and CIA in 2003 and paid $1,156,587.90; all of the Current Director Defendants were members of the Board when the Company acquired certain HHCA assets and liabilities, including its CIA; and all of the Current Director Defendants signed the 2009 10-K, which described in detail the serious legal difficulties the Company would face if it were found to have engaged in improper Medicare billing practices, including but not limited to the penalties for violating the FCA.

73.    According to the 2010 Proxy, Current Director Defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn each earned well over $200,000 for their

services as Board members in 2009. Because the Company is a material source of their personal income, they lack independence and impartiality as to whether to initiate litigation against them on behalf of the Company.

74. In addition, under the Company's "Zero Tolerance Policy" as set forth in the 2009 10-K, the Current Director Defendants are required to terminate the Current Officer Defendants as well as themselves, and the Current Director Defendants and the Current Officer Defendants "may be personally liable to the Company and/or its shareholders and/or third parties (including but not limited to the federal and state government)" for violating the CEBC. The Current Director Defendants have yet to terminate themselves or any of the Current Officer Defendants, or seek reimbursement from themselves or any of the Current Officer Defendants, in connection with the Company's Medicare billing practices, making it highly improbable they could consider a demand to bring an action against themselves on behalf of the Company independently and impartially.

75. It is also clear to us that the Company's Board is not going to act in the best interests of the Company and its shareholders. Instead of instituting its own investigation, the Board authorized the Company to issue a 20 page letter to shareholders, including the following statements:

> **Senate Finance Committee Inquiry:** We have made a number of submissions to the Senate Finance Committee, and expect to make additional submissions as we cooperate with its inquiry. We are confident that our responses will aid the SFC in better understanding our complex industry and therapy utilization in general. We believe the information we have provided, and will provide, will underscore for the SFC the significant value that Amedisys and the home health care industry brings to patients, their families, and the nation's healthcare system.

**SEC Investigation:** We also have received a subpoena from the Securities and Exchange Commission for documents that appear to relate to the matters under review by the Senate Finance Committee. Given the public nature of these matters it is possible that we could receive questions and interest from other regulatory authorities. We intend to cooperate with, and present our views and perspectives regarding these matters in connection with, any such inquiry.

\* \* \*

**Wall Street Journal Article:** We stand by the integrity of our company and our employees. We believe the WSJ article is based upon an inaccurate understanding of a very complex industry and the ever-changing population that we serve, and that it overlooked some important facts, which we have pointed out to the SFC.

76. This purported misunderstanding of the healthcare industry in which Amedisys operates and alleged overlooking of facts has triggered a formal investigation by the SEC into the Medicare billing practices of two other industry participants. These investigations were announced on July 12, 2010, only after the Senate Finance Committee received documents from Amedisys. Moreover, it demonstrates that the Board recognizes that it faces a substantial likelihood of personal liability, cannot be impartial and thus, is denying that any wrongdoing has taken place.

77. Because they face a substantial likelihood of personal liability for their actions/inaction, the members of the Board are lacking in independence and cannot impartially consider a demand on the Board to commence litigation against them. As a result, demand is futile with respect to the entire Board for the reasons described in paragraphs 71-76.

## HARM TO THE COMPANY

78. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, the Company has suffered substantial damage, including but not limited to: the initiation of the SEC formal investigation, and the legal and other

expenses incurred in responding thereto; the initiation of the SFC investigation, and the legal and other expenses incurred in responding thereto; the initiation of the Securities Fraud Actions, and the legal and other expenses incurred in responding thereto; a decline in its market capitalization in excess of 50%; and damage to the Company's image, reputation, and goodwill. Moreover, the Company will continue to incur significant expenses in connection with the above.

79. In addition, the Company faces the prospect of substantial penalties resulting from the SEC investigation and liability from the Securities Fraud Actions, and, potentially most significantly of all, may face an investigation by DOJ, the HHS-OIG, and others that could lead to enormous criminal and civil penalties under the FCA and other statutes, including fines and forfeiture, a new CIA, and other sanctions such as exclusion from furnishing services under any Federal health care program, and legal and other expenses associated therewith.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

80. Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

81. Based upon the allegations set forth in the preceding paragraphs, the Individual Defendants intentionally and/or recklessly breached their fiduciary duties of good faith and loyalty and aided and abetted one another in breaching their fiduciary duties of good faith and loyalty to the Company, and/or failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and

prevent the officers, directors and employees of Amedisys from violating or acting in contravention to, applicable legal requirements.

82.     Those Individual Defendants who participated in or had knowledge of the Company's illegal activities and profited thereby acted intentionally and/or recklessly, thereby breaching their fiduciary duties of good faith and loyalty to the Company.

83.     Those Individual Defendants who failed to implement and oversee adequate internal controls sufficient to monitor and prevent the officers, directors and employees of Amedisys from violating or acting in contravention to applicable legal requirements did so utterly, consciously, and systemically, and did so in breach of their fiduciary duties of good faith and loyalty.  As the result of their utter, conscious, and systemic failure to exercise oversight, the Individual Defendants caused or allowed the Company's business to be conducted in violation of the extensive legal requirements and regulations known to them.

84.     By reason of the foregoing, the Individual Defendants have proximately caused injury to the Company, which has been and will continue to be substantially damaged as the foreseeable result of their wrongful acts and omissions.

85.     Plaintiff, on behalf of Amedisys, has no adequate remedy at law.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR WASTE OF CORPORATE ASSETS

86.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

87.     As a result of their intentional misconduct, and/or the Company's lack of internal controls, and by failing to properly consider the interests of the Company and its

public shareholders by failing to conduct proper supervision, the Individual Defendants have caused Amedisys to waste valuable corporate assets by, among other things, incurring millions of dollars, to investigate, defend and resolve the various proceedings that have been brought and will be brought against the Company arising from Individual Defendants' wrongful actions.

88.     As a result of this waste of corporate assets, the Individual Defendants are liable to the Company.

89.     Plaintiff, on behalf of Amedisys, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff prays for judgment as follows:

A.      Declaring that the directors and officers named as Individual Defendants herein have breached their fiduciary duties as alleged herein;

B.      Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

C.      Requiring the Individual Defendants to remit to the Company all of their salaries and other compensation received for the periods when they breached their duties;

D.      Ordering that the Individual Defendants and those under their supervision and control, refrain from the commission of such further unlawful activities as are alleged herein, and implement comprehensive corrective measures including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein which will rectify all such wrongs as have been committed and prevent their recurrence;

E.     Awarding plaintiff reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 21, 2010

_____
Robert Arceneaux, Bar No. 01199
Robert E. Arceneaux, LLC
47 Beverly Garden Drive
Metairie, LA 70001
(504) 833-7533 office
(504) 833-7612 fax

Pascal F. Calogero, Jr., Bar # 3082
1500 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
(504) 582-2300 office
(504) 582-2310 fax

OF COUNSEL:

COHEN, PLACITELLA & ROTH, P.C.
Stewart L. Cohen
Stuart J. Guber
Jillian A.S. Roman
2900 Two Commerce Square
2001 Market Street
Philadelphia, PA 19130
(215) 567-3500 office

RIGRODSKY & LONG, P.A.
Seth D. Rigrodsky
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5310 office

**VERIFICATION**

I, _Charles E. Erdman Jr._ , hereby declare as follows:

The Northumberland County Pension Fund is a shareholder of
Amedisys, Inc. It was a shareholder at the time of the
wrongdoing complained of and it remains a shareholder. I have
retained competent counsel and I am ready, willing and able to
pursue this action vigorously on behalf of Amedisys, Inc. I have
read the Verified Shareholder Derivative Complaint (the
"Complaint"). Based upon discussions with and reliance upon my
counsel, and as to those facts of which I have personal
knowledge, the Complaint is true and correct to the best of my
knowledge, information, and belief.

_7/20/10_
DATE

_Charles E. Erdman Jr._